# UNITED STATES DISTRICT COURT NORTHERN DISTRICT OF GEORGIA
## Atlanta Division

**HANNAH LEWIS MARLOW,**

      Plaintiff,

v.                                                 Civil Action No: _____

**EQUIFAX INFORMATION SERVICES, LLC**

      Defendant.

## <u>COMPLAINT AND DEMAND FOR JURY TRIAL</u>

COMES NOW the Plaintiff, HANNAH LEWIS MARLOW, by Counsel, and for her Complaint against Defendant, EQUIFAX INFORMATION SERVICES, LLC ("Equifax" or "Defendant"), Plaintiff alleges as follows:

## PRELIMINARY STATEMENT

1. This is an action for actual, statutory, and punitive damages, costs, and attorneys' fees brought for violating Plaintiff's civil rights pursuant to the Fair Credit Reporting Act, 15 U.S.C. §§ 1681–1681x ("FCRA").

2. Plaintiff is the victim of what is now a common crime—identity theft. A fraudster used Plaintiff's personal information to open several accounts, including a credit card account with Fortiva Retail Bank ("Fortiva") and a housing rental account with a company called Compass Property Management. A collection agency

named Southwest Recovery Services ("SRS") is attempting to collect the Compass Property Management rental account by reporting on Plaintiff's credit.

3.      Plaintiff has asserted the actual truth: the accounts do not belong to her, and she did not authorize them.  Although the Fortiva credit card account was deleted after Plaintiff's first dispute to Equifax, Equifax continues to report the fraudulent collection account with SRS.

4.      The FCRA demands that Equifax utilize reasonable procedures to assure the maximum possible accuracy of the information it reports. 15 U.S.C. § 1681e(b). When a consumer disputes an item of information, the agency must investigate the dispute and, if the information cannot be verified, delete it. 15 U.S.C. § 1681i.

5.      This requirement of reasonable procedures designed to ensure the maximum possible accuracy of information Equifax reports is meaningful, and no mere formality. It is not enough for Equifax to simply parrot information it receives from entities like SRS and Fortiva, particularly when a consumer makes a dispute about information reported.

6.      When a consumer disputes information through Equifax, those disputes are transmitted to the party furnishing the information. In this matter, the furnishers were SRS and Fortiva. The FCRA demands that each party separately conduct a reasonable investigation of the consumer's dispute and correct or delete

information they learn to be inaccurate or cannot otherwise verify.

7.    Plaintiff brings claims under Section 1681e(b) against Equifax because it reported inaccurate information about a fraudulent collection account with SRS and a fraudulent credit card account with Fortiva.  When Plaintiff disputed these inaccuracies, Equifax did not reasonably investigate Plaintiff's dispute of the SRS account, also violating § 1681i.

8.    The Consumer Financial Protection Bureau has noted, "experience indicates that [CRAs] lack incentives and under-invest in accuracy" Consumer Fin. Prot. Bureau, Supervisory Highlights Consumer Reporting Special Edition 21 (Issue 14, March 2, 2017).  This is particularly true as to how Equifax has complied with its now 50-year-old obligation to conduct a meaningful accuracy investigation.

9.    Equifax has been repeatedly sued by consumers, sanctions by regulators and reprimanded by both District and Appellate courts to do more than an automated parroting of what their customer-creditors instruct.  Had Equifax followed that advice and heeded those warnings, Plaintiff would not have been harmed.

## JURISDICTION AND VENUE

10.    The jurisdiction for this Court is conferred by 15 U.S.C. § 1681p and 28 § U.S.C. 1367.

11.    Venue is proper in this District and Division as the violations

described in this Complaint occurred in this District, and the Defendant transacts business within this District.

## PARTIES

12.     Plaintiff is a natural person and a "consumer" as defined by 15 U.S.C. § 1681a(c).

13.     Equifax is a limited liability company authorized to do business in the State of Georgia through its registered agent in Peachtree Corners, Georgia.

14.     Equifax is a "consumer reporting agency," as defined in 15 U.S.C. § 1681a(f). Equifax is regularly engaged in the business of assembling, evaluating, and disbursing information concerning consumers for the purpose of furnishing consumer reports, as defined in 15 U.S.C. § 1681a(d), to third parties.

15.     Equifax disburses consumer reports to third parties under contract for monetary compensation.

## FACTUAL ALLEGATIONS

### Sections 1681e(b) and 1681i(a) of the Fair Credit Reporting Act Require Substantive Investigations and Prohibit Mere "Parroting" of the Defendant's Creditor-Customers

16.     "Congress enacted FCRA in 1970 out of concerns about abuses in the consumer reporting industry. See S. Rep. No. 91-517, at 3 (1969); 116 Cong. Rec. 35941 (1970) (statement of Sen. Proxmire); id. at 36570 (statement of Rep. Sullivan); . . .. In enacting FCRA Congress adopted a variety of measures designed

to ensure that agencies report accurate information." *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409, 414–15 (4th Cir. 2001). "In recognition of the critical role that CRAs play in the credit markets and the serious consequences borne by consumers because of inaccurate information disseminated in consumer credit reports prepared by CRAs, Congress placed on a CRA what can only be described as very high legal duties of care, set forth . . . in 15 U.S.C. §§ 1681e(b), 1681i(a)(1)(A), and 1681i(a)(3)(A)." *Burke v. Experian Info. Sols., Inc.*, No. 1:10-cv-1064 AJT/TRJ, 2011 WL 1085874, at *4 (E.D. Va. Mar. 18, 2011).

17.    "Section 1681e(b) sets forth the CRAs' overall du[t]y:

(b) Accuracy of report. Whenever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates."

*Burke,* 2011 WL 1085874, at *4.

18.    "The . . . FCRA . . . was crafted to protect consumers from the transmission of inaccurate information about them, and to establish credit reporting practices that utilize accurate, relevant, and current information in a confidential and responsible manner." *Guimond v. Trans Union Credit Info. Co.*, 45 F.3d 1329, 1333 (9th Cir. 1995) (citations omitted). "'These consumer- oriented objectives support a liberal construction of the FCRA,' and any interpretation of this remedial statute must reflect those objectives." *Cortez v. Trans Union, LLC*, 617 F.3d 688, 706 (3d Cir. 2010) (quoting *Guimond*, 45 F.3d at 1333).

19.    Section 1681i(a), on the other hand, requires much more from a CRA after a consumer has placed it on notice of an inaccuracy through his dispute:

> [I]f the completeness or accuracy of any item of information contained in a consumer's file at a consumer reporting agency is disputed by the consumer and the consumer notifies the agency directly . . . of such dispute, the agency shall, free of charge, conduct a reasonable reinvestigation to determine whether the disputed information is inaccurate and record the current status of the disputed information, or delete the item from the file . . . before the end of the 30-day period[.]

15 U.S.C.A. § 1681i(a)(1)(A).

20.    Section § 1681i(a) imposes "a duty . . . to make reasonable efforts to investigate and correct inaccurate or incomplete information brought to its attention by the consumer." *Cahlin v. Gen. Motors Acceptance Corp.*, 936 F.2d 1151, 1160 (11th Cir. 1991). "[T]he term 'investigation' is defined as '[a] detailed inquiry or systematic examination' or 'a searching inquiry.'" *Hinkle v. Midland Credit Mgmt., Inc.*, 827 F.3d 1295, 1303 (11th Cir. 2016) (citations omitted).

21.    It has long been the law that a CRA, such as Equifax, does not fulfill its "grave responsibility" to conduct a reinvestigation of a consumer's dispute by merely contacting the creditor who supplied the dispute item. *See, e.g.*, *Pinner v. Schmidt,* 805 F.2d 1258, 1262 (5th Cir.1986) (concluding it was unreasonable for a credit reporting agency to contact only the creditor in its reinvestigation of a disputed debt); *Collins v. Experian Info. Sols., Inc.*, 775 F.3d 1330, 1333 (11th Cir.), *on reh'g sub nom. Collins v. Equable Ascent Fin., LLC*, 781 F.3d 1270 (11th Cir. 2015);

*Carlisle v. Nat'l Commercial Servs., Inc.*, No. 1:14-CV-515-TWT-LTW, 2016 WL 4544368, at *9 (N.D. Ga. July 22, 2016), *report & recommendation adopted,* No. 1:14-cv-515- TWT, 2016 WL 4532219 (N.D. Ga. Aug. 29, 2016) ("[A] reasonable factfinder could find that merely contacting [the creditor] was not sufficient to determine whether the disputed information was inaccurate.")

22.     That "grave responsibility" imposed by the FCRA reinvestigation requirement "must consist of something more than merely parroting information received from other sources." *Cushman v. Trans Union Corp.,* 115 F.3d 220, 225 (3d Cir.1997). Accordingly, "a 'reinvestigation' that merely shifts the burden back to the consumer and the credit grantor cannot fulfill the obligations contemplated by the statute." *Id.* The Court held that Trans Union's reading of Section 1681i(a) to require only parroting "would require it only to replicate the effort it must undertake in order to comply with § 1681e(b)[,] render[ing] the two sections largely duplicative of each other." *Id.*

23.     As the Fourth Circuit explained in *Johnson v. MBNA*:

The key term at issue here, "investigation," is defined as "[a] detailed inquiry or systematic examination." Am. Heritage Dictionary 920 (4th ed.2000); see Webster's Third New Int'l Dictionary 1189 (1981) (defining "investigation" as "a searching inquiry").

24.     Further, as Equifax is aware, the Eastern District of Virginia has held that even though the term "investigation" is not used in § 1681e(b), it is clear that

Equifax has a duty to conduct a reasonable initial investigation pursuant to §
1681e(b) as well as § 1681i(a) and that this is "central" to the CRAs' duties of care
under that portion of the Act:

> This conclusion flows from the plain meaning of both [§1681e(b) and
> §1681i(a)]. For example, Section 1681e(b) requires (1) "reasonable
> procedures" that (2) "assure" (3) "maximum possible accuracy." To
> "assure" means "to make sure or certain: put beyond all doubt."
> *Webster's Third New International Dictionary* 133 (1993).
> "Maximum" means the "greatest in quantity or highest degree
> attainable" and "possible" means something "falling within the bounds
> of what may be done, occur or be conceived . . . ." *Id.* at 1396, 1771. It
> is difficult to imagine how "maximum possible accuracy" could be
> guaranteed without an adequate investigation. Likewise, Section
> 1681i(a)(1)(A) requires a "reinvestigation," necessarily implying that
> an "investigation" was required to have been performed in the first
> instance.

*Burke*, 2011 WL 1085874, at *4.

### *The Theft of Plaintiff's Identity*

25.     In approximately 2018, Plaintiff's passport and social security card
were stolen in Detroit, Michigan. In February 2021, Plaintiff started receiving credit
monitoring alerts that her credit score had decreased. Upon investigation, Plaintiff
discovered that she had been the victim of identity theft and accounts had been
opened in her name without her knowledge and consent.

26.     Plaintiff did not receive any notices of delinquent accounts, payments,
or charges for any of the accounts and liabilities the identity thief obtained using
Plaintiff's personal identifying information.

27.     Plaintiff never consented, knew about, or was aware of any of the transactions that the identity thief conducted using Plaintiff's personal identifying information.

28.     One of the accounts that Plaintiff initially discovered was a credit card account with Fortiva. Plaintiff disputed this account with Equifax and it was subsequently removed.

29.     When Plaintiff first discovered the identity theft, the SRS collection account was not yet reporting on her credit.

30.     Plaintiff did not learn about the SRS collection account until approximately July of 2022, when she first saw it on her Equifax credit report.

31.     More specifically, on or about July 25, 2022, Plaintiff obtained a copy of her Equifax credit report and discovered the fraudulent and derogatory SRS collection account, with a balance of $15,111 and the "Original creditor" listed as "COMPASS PROPERTY MANAGEMENT GR".

32.     Equifax's reporting was entirely inaccurate. Plaintiff did not owe anything to Compass Property Management or SRS. The account opened in Plaintiff's name with Compass Property Management was opened by an identity thief, without Plaintiff's knowledge, consent, or permission.

33.     Plaintiff's credit was significantly harmed by the defamatory, inaccurate, and derogatory reporting of the accounts related to identity theft.

34.     The defamatory and inaccurate reporting of the identity theft accounts harmed Plaintiff. Due to this harm, Plaintiff's damages include suffering from depression, humiliation, anxiety, financial devastation, and an inability to build or use credit to make purchases.

### *Plaintiff Disputes the Inaccuracies with Equifax*

35.     On or about September 1, 2022, Plaintiff submitted a dispute letter to Equifax via certified mail regarding the inaccurate and derogatory SRS collection reported on her credit files.

36.     On September 12, 2022, Equifax forwarded Plaintiff a letter requesting her to provide proof and documentation of her personal identity.

37.     Plaintiff subsequently mailed additional information to verify her identity to Equifax. Equifax received this information by certified mail on September 27, 2022.

38.     On September 30, 2022, Equifax forwarded Plaintiff another letter requesting that she provide additional identifying information documentation to verify her identity.

39.     Plaintiff did not receive a copy of the dispute results from Equifax.

40.     On or about April 6, 2023, Plaintiff obtained a copy of her Equifax Consumer Disclosure online. In that report, Plaintiff discovered that Equifax had failed to correct her file and was still reporting the SRS collection account and falsely

showing that Plaintiff owed $15,111.

### *Equifax Did Not and Does Not*
### *Conduct Any Investigation of Most Consumer Disputes*

41.     Unknown to Plaintiff until this lawsuit, it has long been the practice of Equifax to refuse to perform that statutorily mandated FCRA investigation and instead delegate all action in response to consumer disputes to a third-party outsource vendors located overseas.

42.     Equifax uses a third-party document processing company in Atlanta that maintains several Post Office boxes for receiving consumer mail sent to Equifax such as disputes, requests for a credit file disclosure, or other communication. That mailbox company receives consumer disputes and scans them into batches with other disputes. Equifax then forwards the dispute mail batches to a third- party, Teleperformance, based in Mumbai, India.

43.     Equifax uses low-wage employees to work quickly to process consumer dispute letters received, skimming the letters and selecting one or a handful of codes from a dropdown menu to best describe the consumer's detailed dispute information in 2 digits.  For example, the most common relevant code is: "01 Not his/her."

44.     These dispute agents are not allowed to do any of these things: contact the consumer; use the telephone or e-mail to investigate; research; contact the furnisher directly; or take longer than 5 minutes per dispute.

45.     The dispute processing agents are not hired to perform actual FCRA investigations.  Instead, the agent's sole responsibility is to read consumer dispute letters, select one of a handful of common dispute codes from a drop-down menu and then click that code.

46.     Equifax itself did not conduct any reinvestigation of Plaintiff's disputes.  Instead, it merely caused the disputes to be removed from its control to be saved within a database by an overseas data-processing vendor.

47.     Equifax strongly encourages consumers to make disputes through its online website. When consumers do so, the consumer has to click one of just a few available dispute reasons (such as "The balance and/or past due amount are/is incorrect"). The online dispute then is outputted into the "e-Oscar" system described below without ever touching human hands or being read by human eyes at Equifax. It gets sent to its furnisher customers, such as SRS, for its sole review and consideration.

### *Plaintiff Suffered Actual Harm*

48.     Equifax continued to report the derogatory SRS collection accounts on Plaintiff's credit reports, despite being notified that this information was false and fraudulent.

49.     Plaintiff has been attempting to resolve these matters with Equifax and her credit was significantly destroyed by Equifax's failure to correct the inaccurate

reporting.

50.     As a result of the defamatory nature of the inaccurate credit reporting,

Plaintiff has suffered damages, including, but not limited to:

      a.    Stress associated with having to dispute a fraudulent

            collection account of over $15,000 that did not belong to her;

      b.    Monies lost by attempting to fix his credit, e.g.,

            communication costs, postage for disputes;

      c.    Loss of time attempting to cure the error;

      d.    Mental anguish, stress, aggravation, and other related

            impairments to the enjoyment of life.

      e.    Stress associated with attempting to resolve this matter in the
            last year.

### *Defendant's Conduct Was Willful*

51.     The FCRA allows for a remedy for a "willful" violation. A willful act

or violation includes, "not only knowing violations of [the statute], but reckless ones

as well." *Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47, at 57 (2007). A "reckless"

action includes conduct whereby "the company ran a risk of violating the law

substantially greater than the risk associated with a reading that was merely careless."

*Id*. at 69.

52.     Proof of willfulness includes, for example, "evidence that other

consumers have lodged complaints similar to" the one made by Plaintiff and a failure

to make the correction right away. *Dalton*, 257 F.3d at 418; *Saunders v. Branch Banking & Trust Co. of Va.*, 526 F.3d 142, 151 (4th Cir. 2008).

53.     As detailed above, the FCRA section at issue here, and informative guidance, have been around now for over 50 years. The language of § 1681e(b) has not changed. Equifax's dispute investigation obligations under § 1681i(a) have not changed. The FCRA's caution of Equifax's "grave responsibilities" to ensure accuracy has not changed.

54.     Equifax has received thousands of disputes and other complaints regarding the creditors at issue in this case—sufficient to require a reasonable company to at least examine or investigate further before blindly accepting further reporting.

55.     For example, within the past five years alone, SRS has been sued almost two dozen times in federal court for violations related to consumer credit.

56.     In many or even most of these FCRA lawsuits brought by a consumer, Equifax was named as a co-defendant.

57.     Equifax knew or should have known of this litigation history. Equifax uses and has access to PACER to investigate and monitor such consumer complaints.

58.     The CFPB has maintained a Consumer Complaint database since 2017.  It receives a small percentage of the total consumer credit reporting complaints made nationwide, as many multiples more are made directly to the

Defendant, and/or to other government agencies, attorneys, or non-profit organizations.

59.     Equifax regularly receives unredacted consumer dispute details from this database.

60.     Since the database began accepting complaints in 2017, the CRPB has sent hundreds of thousands of consumer reporting complaints to Equifax.

61.     Further, over 190,000 of the CFPB complaints as to Equifax are based largely on Equifax's failure to reasonably investigate consumer disputes.

62.     Just in the last 12 months alone Equifax has been sued over 2,000 times by consumers alleging violation of the FCRA.  Most of these alleged that Equifax violated § 1681i(a) by failing to conduct a lawful reinvestigation of the consumer's accuracy dispute. This complaint history has been true for nearly every year over the last decade.

63.     While the thousands of consumer complaints and hundreds of thousands of consumer disputes alone would have put Equifax on notice of the failures of its dispute investigation procedures in ensuring accuracy, numerous Federal District and Circuit Courts have placed Equifax on notice that it  may not merely "parrot" what their creditor- customer tells them if the consumer had provided a substantive and detailed dispute.

64.     Equifax has repeatedly been criticized by Federal and state regulators, and consumer groups for the refusal or failure to conduct substantive

reinvestigations.

65.     In 2015, a large group of state Attorneys General forced a consent order from Equifax by which it was required to develop procedures necessary to comply with the FCRA.  The AG Settlement required amongst many changes and mandates that Equifax comply with § 1681i(a).[1]

66.     The AG Settlement also required Equifax to conduct significant research and data gathering-even creating a "working group" to address these issues, and to develop special procedures to handle disputes as in this case. Notwithstanding these requirements, Equifax did not meaningfully comply with the AG Settlement in these regards.

67.     Equifax is also aware of substantive and detailed criticism by public interest groups about its automated dispute system. For example, in 2009, the National Consumer Law Center ("NCLC"), the organization that publishes the leading legal treatise in this field, also published a scathing research paper detailing the actual process followed by Equifax when a consumer makes a dispute. That report was updated in 2019. AUTOMATED INJUSTICE REDUX Ten Years after a Key Report, Consumers Are Still Frustrated Trying to Fix Credit Reporting Errors,

---

[1] *Available at* https://www.ohioattorneygeneral.gov/Files/Briefing-Room/News-
Releases/Consumer- Protection/2015-05-20-CRAs-AVC.aspx.

National Consumer Law Center, February 2019. ("NCLC Report").[2]

68. The NCLC Report summarized its context:

Ten years ago, the National Consumer Law Center (NCLC) issued Automated Injustice: How a Mechanized Dispute System Frustrates Consumers Seeking to Fix Errors in their Credit Reports, the landmark report on the serious dysfunctions in the American credit reporting system. Since then, the Consumer Financial Protection Bureau (CFPB) began exercising supervision authority over the Big Three credit bureaus (Equifax, Experian and TransUnion), and started the difficult task of compelling them to reform their procedures and practices. A coalition of more than 30 state Attorneys General reached a breakthrough settlement with the credit bureaus in 2015, requiring an array of reforms. Despite these very laudable achievements, the credit bureaus and the companies that supply them with information still have serious problems in ensuring the accuracy of credit reports, affecting millions of American consumers. The dispute process required by the Fair Credit Reporting Act (FCRA) that was intended to fix these problems remains ineffective and biased.

69. Among many of the Defendant's accuracy failures, the NCLC Report discovered:

• Insufficient Information Conveyed and Considered in Investigation. Credit bureaus use the highly automated e-OSCAR system to convey disputes to furnishers, primarily using shorthand two- or three-digit codes, and at most only a line or two of text in a minority of instances. The credit bureaus use the same four or five codes over 80% of the time.

• Failure to Transmit Information Submitted by the Consumer. Credit bureaus failed to send supporting documentation submitted by consumers to furnishers, in clear violation of the FCRA.

---

[2] *Available at* https://www.nclc.org/images/pdf/credit_reports/automated-injustice-redux.pdf.

- Perfunctory Credit Bureau Investigations. Credit bureaus limit the role of their employees who handle disputes, or of the foreign workers employed by their offshore vendors, to little more than selecting these two- or three-digit codes. Workers do not examine documents, contact consumers by phone or email, or exercise any form of human discretion in resolving a dispute.

- Credit Bureaus Always Side with Furnishers. Credit bureaus are universally biased in favor of furnishers and against consumers in disputes. In a practice known as "parroting," credit bureaus blindly adopted the response of the furnisher without performing any independent review.

NCLC Report at 6.

70.     Despite the notice and judicial, regulatory, and public interest criticism, Equifax has refused to change its dispute investigation process because it would cost too much money to do so.

71.     Equifax's procedures imposed on Plaintiff and similarly situated consumers an unjustifiably and unreasonable risk of harm that could have been mitigated or avoided with just modest imposition.

## CLAIMS FOR RELIEF

### COUNT I:
### VIOLATION OF THE FAIR CREDIT REPORTING ACT
### 15 U.S.C. § 1681e(b)

72.     Plaintiff re-alleges and incorporates all other factual allegations set forth in the Complaint.

73.      Equifax violated 15 U.S.C. § 1681e(b) by failing to establish or to

follow reasonable procedures to assure maximum possible accuracy in the preparation of the credit report and credit files is published and maintained concerning Plaintiff.

74.    Further, after Plaintiff's disputes put Equifax on notice of likely inaccuracies and reasons to doubt the correctness of the reporting of its creditor-customers, Equifax ignored such information and did not use any human or substantive review to confirm and verify that its procedures were ensuring maximum possible accuracy of Plaintiff's credit reports.

75.    Equifax furnished multiple consumer reports to third parties containing the inaccurate tradeline information and it did so after receiving notice of these inaccuracies.

76.    As a result of this conduct, action, and inaction of Equifax, Plaintiff suffered actual damages, including but not limited to:  loss of credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

77.    The violations by Equifax were willful, rendering Equifax individually liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n. In the alternative, if Equifax is negligent, Plaintiff is entitled to recover under 15 U.S.C. § 1681o.

78.    Plaintiff is entitled to recover costs and attorneys' fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n and/or §

1681o.

## COUNT II:
## VIOLATION OF THE FAIR CREDIT REPORTING ACT
## 15 U.S.C. § 1681i(a)

79.     Plaintiff re-alleges and incorporates all other factual allegations set forth in the Complaint.

80.     Equifax willfully violated 15 U.S.C. § 1681i by failing to delete inaccurate information in Plaintiff's consumer file after receiving actual notice of such inaccuracies; by failing to conduct a lawful reinvestigation; by failing to forward all relevant information to SRS; by failing to maintain reasonable procedures with which to filter and verify disputed information in Plaintiff's credit file; and by relying upon verification from a source it has reason to know is unreliable.

81.     Further, Equifax violated Section 1681i by conducting ***no investigation at all***. Section 1681i demands that when Plaintiff notified each CRA directly of her disputes, that party-the consumer reporting agency who received the disputes-must investigate those disputes. The statute does not contemplate someone other than Equifax conducting the investigation.

82.     Yet, Equifax used an unrelated third-party, Teleperformance, over which it has control, to conduct its investigations. Teleperformance is not, in the words of the statute, "the [consumer reporting] agency" to whom Plaintiff disputed.

Equifax therefore violated 1681i on this basis because it sent Plaintiff's disputes away to acompany that was not its controlled agent rather than investigating them as required.

83.    As a result of Equifax's violations of 15 U.S.C. § 1681i(a), Plaintiff suffered actual damages, including but not limited to:  loss of credit, damage to reputation, embarrassment, humiliation, and other mental and emotional distress.

84.    The violations by Equifax were willful, rendering Equifax liable for punitive damages in an amount to be determined by the Court pursuant to 15 U.S.C. § 1681n.  In the alternative, Equifax was negligent, entitling Plaintiff to recovery under 15 U.S.C. §1681o.

85.    Plaintiff is entitled to recover actual damages, statutory damages, punitive damages, costs and attorney's fees from Equifax in an amount to be determined by the Court pursuant to 15 U.S.C. §1681n and/or §1681o.

## JURY DEMAND

Pursuant to Federal Rule of Civil Procedure 38, Plaintiff hereby demands a trial by jury of all issues triable by jury.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands judgment and actual, statutory, and punitive damages against Defendant, jointly and severally; for her attorneys' fees and costs; for pre- judgment and post-judgment interest at the legal rate, specific

performance and injunctive relief, and such other relief the Court does deem just and proper.

Date: August 1, 2024

Respectfully submitted,

**HANNAH LEWIS MARLOW**

By: */s/ Jeffrey B. Sand*
Jeffrey B. Sand
**WEINER & SAND LLC**
800 Battery Ave., Suite 100
Atlanta, Georgia 30339
(404) 205-5029 – Telephone
(866) 800-1482 – Facsimile
Email: js@wsjustice.com

Craig C. Marchiando, *pro hac vice forthcoming*
Leonard A. Bennett, *pro hac vice forthcoming*
**CONSUMER LITIGATION ASSOCIATES, P.C.**
763 J. Clyde Morris Blvd., Suite 1-A
Newport News, VA 23601
(757) 930-3660 – Telephone
(757) 930-3662 – Facsimile
Email:  craig@clalegal.com
Email: lenbennett@clalegal.com

Drew D. Sarrett, *pro hac vice forthcoming*
**CONSUMER LITIGATION ASSOCIATES, P.C.**
626 E. Broad Street, Suite 300
Richmond, Virginia 23219
Telephone: (804) 905-9900
Facsimile: (757) 930-3662
Email: drew@clalegal.com

*Counsel for Plaintiff*